UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JASON FRY,

     Plaintiff,

     v.                                                                Case No. 3:22-CV-140 JD

ANCESTRY.COM OPERATIONS INC., et
al.,

     Defendants.

## OPINION AND ORDER

Ancestry.com[1] uses the school yearbook photos and names of many people to advertise its subscription-based genealogy website without the knowledge or consent of those depicted. Jason Fry, an Indiana resident, is one such person. He brings the instant suit on behalf of himself and other similarly situated Indiana residents, whose common law and statutory rights of publicity have been violated by Ancestry's use of their names and likenesses in its advertising. Ancestry filed a motion to dismiss, arguing this Court does not have personal jurisdiction over Ancestry, that Mr. Fry does not have standing to bring his claims, that he has failed to state a claim, and that his claims fail due to several applicable statutory provisions. Therefore, the Court DENIES Ancestry's motion to dismiss (DE 18), finding the facts alleged, if true, support the Court's jurisdiction over Ancestry, Mr. Fry's standing to bring his case, and the facial sufficiency of his claims. The Court further finds Ancestry's statutory arguments do not entitle it to dismissal.

---

[1] Mr. Fry has sued three related entities, and both parties refer to them collectively as Ancestry. This Court will follow suit. At points, the Court refers to Ancestry.com in order to specify the website or genealogy part of the Ancestry business. The Court does not intend to relieve any particular entity of liability by using the name Ancestry.com.

## A. Facts

Ancestry is a genealogy website and DNA testing business with broad popularity in the United States and worldwide. This suit concerns Ancestry's genealogy website, Ancestry.com. Ancestry has compiled billions of records, including 730 million school yearbook photos. 33 million of these yearbook records correspond to Indiana schools. Ancestry encourages Ancestry.com subscribers to use records to build their own interactive family trees, thereby learning more about their relatives, living or dead. While technically a user can search for any person, the intent of the Ancestry product is that users employ the records for genealogical purposes, and most users search for persons they know or family members.

When a person visits Ancestry.com, a public landing page allows the visitor to search by name and location for any person. The Ancestry website then delivers a list of yearbook photos it believes may correspond to the person of interest. The results page also includes a pop-up window that says, "There's more to see" about the person of interest and encourages the visitor to "Sign Up Now." Clicking through the pop-up takes the visitor to a webpage where they can select a paid subscription plan and begin their free trial. After such a search, Ancestry sends targeted promotion emails teasing hints about the person of interest. These emails contain the person of interest's name and likeness. If the email recipient clicks on links contained within the email, they are again prompted to sign up for a paid subscription plan. When using a free trial membership, a visitor can view the full records of the person of interest including their school yearbook photos. Ancestry hopes that upon enjoying the benefits of a free trial, the visitor will sign up for a paid subscription, so the free trial itself is also a form of advertising.

Mr. Fry, an Indiana resident, was one such person of interest. Mr. Fry is not a subscriber or user of Ancestry, but his Indiana high school yearbook photos are available for view on

Ancestry to those who have searched for him. Mr. Fry did not consent to his likeness being used for advertising, nor does he endorse Ancestry's services. Mr. Fry finds the aforementioned uses of his name and likeness in Ancestry's advertisements objectionable, as it encroaches on his right of publicity and discovering that his likeness might so be used has caused him psychological stress. Mr. Fry has brought suit claiming that Ancestry violated Indiana's right of publicity statute, Ind. Code § 32-36-1, *et. seq*., ("the Indiana statute") and his common law right of publicity. Ancestry now moves to dismiss Mr. Fry's claims.

### B. Legal Standard

A 12(b)(6) motion challenges the sufficiency of the complaint's allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). To satisfy the federal pleading requirements, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a motion to dismiss under Rule 12(b)(6), the Court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). "While a plaintiff need not plead detailed factual allegations to survive a motion to dismiss, she still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). A plaintiff's claim may only be dismissed based on an affirmative defense under Rule 12(b)(6) if "the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). Otherwise, "plaintiffs need not anticipate and attempt to plead around all potential defenses." *Id*.

### C.  Discussion

Ancestry argues this Court does not have specific personal jurisdiction because Indiana represents a small portion of its business, and it does not target the forum when users residing in Indiana access the website. The Court does not find this persuasive, as Ancestry purposely seeks out nationwide business, including that in Indiana, and Mr. Fry's suit arises from those contacts. No unfairness arises from this Court's exercise of personal jurisdiction. Further, when his allegations are credited, Mr. Fry has standing to pursue his claims because his injuries are sufficiently concrete. The Court also finds Mr. Fry's likeness has commercial value, rendering him a protected personality under the statute, and finds none of the statutory defenses raised by Ancestry apply.

#### *(1)  This Court has personal jurisdiction over Ancestry.*

Ancestry argues this Court lacks personal jurisdiction over it; Mr. Fry in turn argues Ancestry has targeted the forum, and therefore, the Court has specific personal jurisdiction. Mr. Fry gets the better of the argument. Specific jurisdiction "arises out of or relates to the defendant's contacts with the forum." *Daimler AG v. Bauman*, 571 U.S. 117, 128 (2014). "Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposely availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). "It is [the defendant] reaching out to the residents of [the forum state], and not the residents reach back, that creates the sufficient minimum contacts." *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir. 2010). When considering web businesses, the Court asks whether the defendant in some way targeted the forum state's market beyond simply operating an interactive website that is accessible from

4

the forum state. *be2 LLC v. Ivanov*, 642 F.3d 555, 558–59 (7th Cir. 2011). The targeting

requirement is met when the web-based business extensively markets and sells to residents

within the state. *See uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 427 (7th Cir. 2010). Where

a company continuously and deliberately seeks a nationwide audience, there is no unfairness in

calling it to answer for its actions in any state where it does substantial business. *Keeton v.*

*Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984). Accordingly, the Court will assess Ancestry's

purposeful availment of business in the state of Indiana and whether the injuries alleged arise out

of Ancestry's Indiana-related activities.

The Court turns to the decisions of two sister district courts addressing the same issues

among the same parties for guidance. *See Sessa v. Ancestry.com Operations Inc.*, 561 F. Supp.

3d 1008 (D. Nev. 2021); *Bonilla v. Ancestry.com Operations Inc.*, 574 F. Supp. 3d 582 (N.D. Ill.

2021). As in *Sessa*, this Court finds that it "strains credulity that Ancestry would not know that,

by creating a commercial database of many millions of Americans" including records from an

estimated 33 million Indiana schools, it was targeting the market and thereby may be haled into

court in Indiana. 561 F. Supp. 3d at 1026. Ancestry held itself out to do business with Indiana

residents, specifically advertised to persons located in Indiana, and hoped its services would

become popular nationwide, including in Indiana. As *Sessa* found, "Ancestry has sought to build

a database with nationwide appeal by allegedly collecting as many yearbooks as possible from

across the country. Ancestry intentionally targeted all fifty states in doing so." 561 F.Supp.3d at

1026. Though Ancestry protests that Indiana makes up a small amount of its business, that factor

is not dispositive, as the targeting inquiry does not require that the forum be one of special

interest—just significant contact. *See uBID*, 623 F.3d at 427–28 (web company could be haled

into Illinois where it sought to do business there and everywhere else). Further, one could

imagine ways Ancestry would limit that business if it did not seek to do business in Indiana. When purchasing its yearbooks, it might say, "No Indiana schools, please!" and it might choose not to send ad emails to those users whose IP addresses indicated they were located in Indiana. *Cf. Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir. 2010) (business "targeted to do business" with forty-nine states where it shipped anywhere but New York). Ancestry did not do this. The Court finds no unfairness by haling Ancestry into court in Indiana.

The Court further finds that Mr. Fry's claim arises out of or relates to Ancestry's minimum contacts with Indiana. Courts may consider advertisements as part of the conduct indicating targeting of the forum, and this case arises out of those very advertisements to Indiana residents. *See uBID*, 623 F.3d at 427. The advertisements to Indiana residents are both the proximate cause of Mr. Fry's injury and part of the minimum contacts; this satisfies even the most stringent standard under the second prong. *Id.* at 430; *cf. Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014), as corrected (May 12, 2014) (sales and advertisements had no connection with trademark infringement cause of action). Plus, as Mr. Fry has alleged, Ancestry is most likely to show the ads featuring his likeness to those within his social circle, who have a higher likelihood of remaining in Indiana. *See Walden v. Fiore*, 571 U.S. 277, 287–88 (2014) (reputational harms necessarily occur in the plaintiff's community, forming stronger connection between the defendant and the plaintiff's state of residence). The Court therefore finds the elements of specific personal jurisdiction are met and the Court may exercise personal jurisdiction over Ancestry.

**(2)  Mr. Fry has adequately pled a concrete injury sufficient to sustain Article III standing.**

The Court finds Mr. Fry's two alleged injuries are sufficiently concrete under Supreme Court precedent because they have common law analogs or arise at common law and because Mr. Fry alleges these injuries actually happened to him. The Court notes it is Mr. Fry's burden to show standing at all stages and rejects Mr. Fry's argument that he will not need to offer evidence of some actual injury to himself in later proceedings to recover.

*(a)  Mr. Fry alleges two sufficiently concrete injuries giving rise to Article III standing.*

The allegations of injury in the complaint are sufficiently concrete to give Mr. Fry Article III standing to sue. Mr. Fry's response brief identifies four injuries, which are needlessly complex in their formulation. Mr. Fry elaborates on the kind of harms that misappropriation can lead to, including economic losses and, confoundingly, referring to his likeness as "intellectual property." He states these as though they are the concrete injuries, but this is unnecessary, as the interest protected by the rule against misappropriation is itself an injury if invaded, and no showing of downstream effects is necessary. Restatement (Second) of Torts § 652C cmt a (1977) (this section protects a right in the nature of a property right); *see also Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022) (reputational harm is a real-world injury and sufficiently concrete; no downstream injuries need be demonstrated). Thus, actual misappropriation or a violation of Mr. Fry's right to publicity rights satisfies the requirements of *Spokeo*; no elaborate formulation of the injury is necessary. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). More simply, Mr. Fry's complaint alleges that he was injured by the unauthorized use of his likeness, which has been recognized at length to be a cognizable injury in

7

the common law, and that he suffered psychological distress because he feared the risk that his image would be shared and that his contacts would wrongfully presume his endorsement. These allegations of injury are sufficiently concrete under both *Spokeo* and *TransUnion* to state a claim. *See id.*; *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2209–10 (2021).

The Court must first inquire whether Mr. Fry's statutory claim states an injury similar to those recognized at common law. In *Spokeo*, the Supreme Court held that a bare procedural violation of a Congressionally-enacted statute divorced from any concrete harm could not satisfy Article III standing. 578 U.S. at 341. In order to determine whether a concrete harm exists for statutory violations, a court must consider both the judgment of the enacting body and whether the harm has a close relationship to one traditionally regarded as providing a basis for a lawsuit in English or American courts. *Id*. One alleged injury in Mr. Fry's statutory claim is the injury to his right of publicity, a substantive right. The Indiana statute largely codifies the common law right of publicity. *Daniels v. FanDuel, Inc*., 109 N.E.3d 390, 394–95 (Ind. 2018) ("*Daniels I*"). At common law, the misappropriation of the person's likeness is an injury to the right of publicity in itself. *See* Restatement (Second) of Torts § 652C cmt a (1977) (the right of publicity is in the nature of a property right). Therefore, the statutory injury has a basis in the common law and alleging a violation of the statute would be sufficiently concrete to give rise to Article III standing. *See* 578 U.S. at 341; see also *Gadelhak v. AT&T Servs*., Inc., 950 F.3d 458, 462 (7th Cir. 2020) (finding a statutory injury concrete by analogy to intrusion upon seclusion).

Though the right of publicity was recognized relatively recently, its roots stretch back further, such that the basis of the substantive right within the common law is undeniable. It, along with the other privacy torts, was distilled from courts' earlier First Amendment and defamation precedents; privacy torts frequently cross-cite and borrow terminology from

defamation cases. *See Zacchini v. Scripps-Howard Broad. Co*., 433 U.S. 562, 570–72 (1977) (recognizing misappropriation and describing the history of the privacy torts); *Time, Inc. v. Hill*, 385 U.S. 374, 386–87 (1967) (discussing New York false light precedent in light of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), decided only a few years prior); *Daniels I*, 109 N.E.3d at 396 (construing "newsworthy" consistent with First Amendment precedent). This creates a constitutionally cogent body of law, but the ties run deeper, to the heart of what it means to be defamed or have one's likeness misappropriated: harm to one's reputation. *See* Restatement (Second) of Torts § 652C cmt c (1977)(use of one's reputation is appropriation). Reputation harm has been recognized as sufficiently concrete under *Spokeo* by our circuit in the context of defamation. *See Ewing*, 24 F.4th at 1154 (reputational harm is a real-world injury and sufficiently concrete to create standing). Given the close ties between defamation and misappropriation, including their cogency as a body of law, their near simultaneous formulation under Supreme Court precedent, and interests protected, this Court has no hesitancy in finding that harm to reputation, as recognized by the right of publicity, has deep roots as a concrete injury in the common law.

Mr. Fry also alleges a second injury: the psychological injury caused by the stress of worrying if his likeness would be disseminated and to whom. The Supreme Court's recent precedent allows such a claim as a distinct and concrete injury. In later stages, Mr. Fry and other class members will have to show that this injury actually occurred and was sufficiently serious to be actionable; a few minutes of annoyance or concern would not suffice. *See Gadelhak v. AT&T Servs., Inc*., 950 F.3d 458, 463 (7th Cir. 2020) (recognizing some annoyances are too minor to be

actionable at common law).[2] This Court notes a fine distinction that may become important later: Mr. Fry has stated the injury is the psychological stress caused by worrying that his likeness may be used, not the risk itself. In *TransUnion*, the Court wrote that the risk of harm generally can only sustain a petition for injunctive relief but might sustain a claim for damages if the exposure to the risk caused a separate concrete harm, such as psychological distress analogues to the harm captured by IIED claims. 141 S.Ct. at 2210–11. The Court finds Mr. Fry has adequately pleaded the psychological injury, and the injury could sustain either a claim for damages or injunctive relief.

(b)   *The Court notes Mr. Fry will bear the burden of establishing standing by showing a concrete violation at summary judgment and trial.*

The Court pauses to note that while Mr. Fry's allegations are sufficient, Mr. Fry will continue to bear the burden of establishing standing throughout the life of this litigation. *See Midwest Fence Corp. v. United States Dep't of Transportation*, 840 F.3d 932, 939 (7th Cir. 2016). While the Court would normally contain itself to the motion at hand, the Court found an argument included by plaintiff's counsel in Mr. Fry's response brief disquieting. Mr. Fry adequately alleged Ancestry displayed the advertisements incorporating his name and yearbook photograph to people in Indiana in paragraph 60 of the complaint. (DE 1 at 19.) He also included screenshots of the advertisements containing his name and likeness, which allegedly were shown to persons who knew him in Indiana. (DE 1 at 8–15.) However, in the response brief, Mr. Fry writes those screenshots were "displayed to Plaintiff's attorneys during the investigation and preparation of the Complaint." (DE 24 at 11.) The response also includes as an exhibit a sworn

---

[2] The Court finds plausible that Mr. Fry and some other people might find the use of their likeness in Ancestry's ad highly distressing. While the Court has some doubts regarding the numerosity of these people, the Court does not attempt to prescribe or summarize society's shifting mores regarding privacy online as a matter of law.

statement by a person engaged by counsel to search for Mr. Fry on Ancestry just days before the response was filed. (DE 24-1.) If these constitute the only uses of Mr. Fry's likeness in Ancestry's advertising, Mr. Fry would not have standing under his actual injury theory because his injury would be entirely self-inflicted.

The Court takes seriously its obligations under Rule 12(b)(6) and credits the allegations in the complaint as true. These allegations allege members of the public "may and *have* searched for Mr. Fry by name" and detail at length how Ancestry "sends these and similar emails bearing Mr. Fry's and Class members' names and likeness to user*s*." (DE 1 at ¶¶ 34; 39.) For the purpose of this motion, the Court believes these allegations and finds them adequate to allege that Mr. Fry's name and likeness were used in advertisements to third parties. However, the Court is concerned that Mr. Fry's other statements evince a possible belief that he will not need to prove his image was used in advertisements to third parties at a later stage; this is incorrect. *See Spokeo,* 578 U.S. at 340 (a concrete injury "must actually exist").

The Court cautions that in order for Mr. Fry to have standing based on the first alleged injury, the offending conduct—the misappropriation of his likeness for commercial gain—*has to have actually happened* at least one time. *See TransUnion*, 141 S. Ct. at 2206 ("An uninjured plaintiff who sues in those circumstances is, by definition, not seeking to remedy any harm to herself" and does not have standing). And this kind of claim—misappropriation in advertising— necessarily requires that some third party saw the advertisement at some point. It will not suffice if the advertising occurred only to Mr. Fry's attorneys for the purpose of litigation, as that defies all logic. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). It is silly to complain at length that one is

devastated by the *unauthorized* use of his yearbook photo to sell a product where *he orchestrated the use* and the injury may not have occurred but for his initiative. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (self-inflicted injury severs the connection between the defendant and the harm).

Mr. Fry appears to contest the relevance of the actual use of his likeness in advertising, stopping just short of arguing that advertising to his attorneys alone for the purpose of this litigation is sufficient. He argues that this action is distinct from *TransUnion* because unlike defamation, misappropriation does not depend on disclosure to a third party, so there is no need for his photo to have been actually used. This misses the mark; while there is no disclosure requirement, both the statute and the common law require the *use* of a person's likeness; there is no liability for mere possession of a person's photo. *See* Ind. Code § 32-36-1-8(a). And it is difficult to think of a use "for advertising" or "on or in connection with a product" that does not involve disclosure to some third party; Mr. Fry certainly has not alleged one. *See* Ind. Code § 32-36-1-2. So, while the Court does not intend to subject Mr. Fry's claims to a defamation analysis, his claim is like all others in that *something* must have actually happened (other than the decision to sue) before liability can accrue. *See Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 911 (7th Cir. 2017) ("as otherwise the federal courts would be flooded with cases based not on proof of harm but on an implausible and at worst trivial risk of harm"). Similarly, the psychological injury must also have occurred; on summary judgment, the plaintiffs will have to show the class members at least knew about the possibility that their likenesses would be used for Ancestry's advertising and that the psychological harm is sufficient to constitute an injury capable of sustaining a cause of action. *See TransUnion,* 141 S.Ct. at 2211; *see also Gubala*, 846 F.3d at 911 (plaintiff who did not allege plausible concrete risk of harm did not have standing).

12

These concerns do not rise to the level that the Court feels it must look beyond the pleadings, especially since Ancestry has not provided evidence showing Mr. Fry lacks standing, and Mr. Fry has not been afforded an opportunity to clarify his statements. *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) (court may look at evidence submitted on the issue where external facts call the court's jurisdiction into question on motion to dismiss). The inquiry treads too close to a factual determination to be comfortable at this juncture, and the Court trusts that Mr. Fry will later produce evidence of the truthfulness of his allegations: that his likeness was used in advertisements to someone other than his attorneys or their agents.

### *(3) Mr. Fry properly pled his Indiana Right of Publicity Claim.*

Mr. Fry properly pled a claim under Indiana's law prohibiting use of a personality's right of publicity because his likeness has commercial value and his territoriality allegations are adequate. The statute reads: "A person may not use an aspect of a *personality's* right of publicity for a commercial purpose during the personality's lifetime or for one hundred (100) years after the date of the personality's death without having obtained previous written consent from a person specified in section 17 of this chapter." Ind. Code § 32-36-1-8(a). Mr. Fry's likeness has commercial value sufficient to render him a qualifying "personality" under the statute, and he has sufficiently alleged territoriality.

### *(a)   He is a personality because his likeness has commercial value.*

Ancestry argues that Mr. Fry does not qualify for the protection of the statute because he is not a qualifying personality, as his name and likeness have no commercial value. The statute prohibits the use by a person of "an aspect of a personality's right of publicity for commercial purposes." Ind. Code § 32-36-1-8(a). The statute defines a personality as "a living or deceased natural person whose: (1) name; (2) voice; (3) signature; (4) photograph; (5) image; (6) likeness;

(7) distinctive appearance; (8) gesture; or (9) mannerisms; has commercial value, whether or not the person uses or authorizes the use of the person's rights of publicity for a commercial purpose during the person's lifetime." Ind. Code § 32-36-1-6. "Commercial value" is not defined. The core question becomes what does it mean to have commercial value within the context of the statute, and does Mr. Fry's name or likeness have it?[3]

Though precedent on the issue is not voluminous, the Court finds it fairly obvious that Mr. Fry's name and likeness have commercial value. Why else would Ancestry bother to include it in its advertisements? *See McFarland v. Miller*, 14 F.2d 912, 922 (3d Cir. 1994) ("In taking [plaintiff's] name, [defendant] unfairly sought to capitalize on its value. The very act of taking it for that purpose demonstrates the name itself has worth.") Ancestry lodges two objections to this reading: (1) the commercial value must be shown by Mr. Fry: that it must be his monetary loss, and he must make some demonstration that he could license his image or he had plans to do so, and (2) basing the commercial value on Ancestry's use of Mr. Fry's likeness renders surplus the statute's requirement of a use for a "commercial purpose." The first of these, that Mr. Fry must show the loss, is easily disposed with: the Indiana statute clearly states commercial value exists regardless of whether the personality ever exercises their right of publicity, and the common law, upon which the statute is based, entitles "individual[s] to the exclusive use of his own identity;" he may grant a license to a third person to use his identity for their benefit, but he alone owns the right. Ind. Code § 32-36-1-6; Restatement (Second) of Torts § 652C cmt a (1977). Once again,

---

[3] Ancestry argues on reply that Mr. Fry has not stated a claim because he cannot allege his yearbook image had "commercial value." (DE 29 at 13.) But that is not the correct inquiry—the statute is concerned with whether Mr. Fry's likeness (that is, his visage, his appearance, his very him-ness) has commercial value, not whether the specific manifestation of his likeness had commercial value.

the Court will not require Mr. Fry to show further harms where the appropriation of his likeness is already recognized as an injury at common law. *See Ewing*, 24 F.4th at 1153.

The Court does not find Ancestry's statutory interpretation argument persuasive because the distinction between commercial purpose and commercial value requires a more subtle analysis than Ancestry has afforded it. There is commercial value to Mr. Fry's likeness because Ancestry shows the ads to people who search for Mr. Fry and therefore are likely to know him. The commercial value at work in Ancestry's display of Mr. Fry's image is leveraging his likeness and the ideas it inspires—his reputation and his life in the mind's eye of others—to sell a product. *Kellman v. Spokeo, Inc*., 599 F. Supp. 3d 877, 891 (N.D. Cal. 2022) (interpreting identical statute and finding reputation within the relevant community can support commercial value); see also *See Cheatham v. Paisano Publications, Inc.*, 891 F. Supp. 381, 386–87 (W.D. Ky. 1995) (commercial value means distinctiveness of the identity plus degree of recognition of the person among those receiving the publicity). Indiana statute's commercial value requirement captures the same values as the Restatement's comment (c), which provides that "the defendant must have appropriated to his own use or benefit the *reputation, prestige, social or commercial standing, public interest or other values* of the plaintiff's name or likeness." *See* Restatement (Second) of Torts § 652C cmt c (1977). The ad is only effective (and the use commercially valuable) if a person knew Mr. Fry at some point, otherwise, the viewer is unlikely to feel moved or compelled in any way by Mr. Fry's likeness.[4]

---

[4] "Peer-to-peer" marketing is of growing interest in many industries, and commentators note it may be more effective than traditional advertising or influencer marketing because people trust their friends and family. *See* Wissman, Barrett, *Peer-to-Peer is the Next Wave of Influencer Marketing*, Entrepreneur.com (June 20, 2019). Our reputations, standing in our communities, and social connections are undeniably valuable; their ability to sell products is well-established in modern life.

Ancestry argues that defining the commercial value in terms of what Ancestry gained by using Mr. Fry's likeness renders the statute's "commercial purpose" requirement extraneous. Under Indiana rules of statutory interpretation, "courts should try to give effect to each word in a statute, [but] they ought not to do so myopically. Instead, the statute should be examined as a whole, avoiding both excessive reliance on strict literal meaning and selective reading of individual words*." Est. of Moreland v. Dieter*, 576 F.3d 691, 695 (7th Cir. 2009) (applying Indiana law). The statute defines "commercial purpose" as the use of an aspect of a personality's right of publicity "(1) On or in connection with a product, merchandise, goods, services, or commercial activities. (2) For advertising or soliciting purchases of products, merchandise, goods, services, or for promoting commercial activities. (3) For the purpose of fundraising." Ind. Code § 32-36-1-2 (punctuation original). This is not a difficult question of statutory interpretation, as a brief exercise demonstrates that the Court's definition of commercial value is easily reconcilable with the commercial purpose requirement while giving effect to all provisions. One could imagine a scenario where a common person's image is used in the same manner as in Ancestry's ads (commercial purpose under prong 2), but inspires no recognition; for instance, if Ancestry sent Mr. Fry's community the yearbook photos of this Court's judicial law clerks, who have no reputation, prestige, or standing in Mr. Fry's community. This would not be commercially valuable—the recipients would likely be confused at best. And one could imagine an instance where Mr. Fry's likeness was used in a different sort of Ancestry ad (commercial purpose) without commercial value, such as if he merely appeared as an unavoidable background bystander in a television ad shot in a city. When the Court says, "Why else would Ancestry have used Mr. Fry's image?" the Court is not conflating commercial purpose with commercial value, but merely resting on expressions of logic to capture our

16

changing reality: that businesses increasingly leverage our closest and most precious connections

online to sell products. Therefore, finding that Mr. Fry's likeness had commercial value does not

render it duplicative of the statute's commercial purpose requirement. Mr. Fry has stated a cause

of action alleging his personality was appropriated, because his complaint alleges his likeness

was used in advertisements to the community in which he is recognized.[5]

*(b)   Territoriality hangs on the same allegations as standing.*

Ancestry also argues that Mr. Fry has failed to properly allege territoriality, as the statute

requires violations occur "within Indiana." *See* Ind. Code § 32-36-1-8(a). The Court notes other

courts applying this territoriality provision have struggled with the question of which acts must

occur in Indiana. *See Kellman*, 599 F. Supp. 3d at 893 (applying "unsettled" Indiana law to the

Indiana statute). The Court would be entitled to defer consideration of this complex issue until

discovery had taken place. *Id*. However, the Court finds Mr. Fry has pled an act that occurred

within Indiana—that people in Indiana were advertised to by Ancestry with photos containing

his likeness. (DE 1 at ¶¶ 2; 60.) Even under the strictest reading of Indiana's territoriality

requirement, this suffices. *See Boshears v. PeopleConnect, Inc.*, No. C21-1222 MJP, 2022 WL

888300, at *3 (W.D. Wash. Mar. 25, 2022) (properly pled allegations of non-consensual use of

plaintiff's likeness in Indiana may be sufficient to satisfy Indiana's territoriality requirement). As

with standing, the evidence will need to eventually support Mr. Fry's territoriality allegations,

but the pleading is legally sufficient, and that is all that is required at this stage.

---

[5] The Court has some discomfort concerning the recognition principle given the predominance of algorithms that show the content and likeness of unknown persons to users outside their social circle, e.g. those used by TikTok and Instagram "Reels." One could imagine a business misappropriating the likeness of a formerly unknown regular person who "goes viral" in the misappropriating post. It seems proper that courts might pay close attention when tailoring the recognition within the community inquiry in order to best approximate the expectations of the common law.

### (4)  Mr. Fry properly pled his common law misappropriation claim.

There is scant precedent regarding common law misappropriation in Indiana. We know from the Court's decision in *Felsher* that such a right exists, and the claim requires "appropriation, for the defendant's benefit or advantages, of the plaintiffs name or likeness," but we have little other guidance regarding its interpretation. *See Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 601 n.24 (Ind. 2001). As such, it is appropriate for the Court to apply the Restatement and precedent from other courts applying the Restatement. *Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089, 1100 (D. Ariz. 2006) (applying Restatement in the absence of Arizona precedent). Other than the failed arguments also lodged against the statutory claim, Ancestry has not stated any missing element of common law misappropriation in the complaint, and the Court independently finds the requirements are met. The Court finds Mr. Fry has stated a claim for common law misappropriation for the reasons stated above, and now moves to other statutory arguments that Ancestry argues eviscerate both his common law and statutory claims.

### (5)  None of Ancestry's other arguments are persuasive on this motion.

Ancestry launches a number of other attacks at Mr. Fry's claims. The Court does not find them persuasive or capable of defeating Mr. Fry's claims.

#### (a)   This use does not fall into the statutory exceptions or incidental use.

Ancestry argues the advertisements fall into the statutory exception for material that has political or newsworthy value or the exception for literary works. Ind. Code § 32-36-1-1(c)(1). The Court begins with the exception for "material that has political or newsworthy value." *Id*. The Court can easily see how the trove of records contained in the Ancestry.com website would be considered newsworthy under the broad reading established in *Daniels I*. 109 N.E.3d at 396

18

(newsworthiness "include[s] all types of factual, educational and historical data, or even

entertainment and amusement, concerning interesting phases of human activity in general"). The

ability to capture the past and discover one's ancestral roots certainly strike the Court as within

the public interest and of historical and educational significance. But the exception specifies that

it is for *material that has value*, so the value must be in the challenged use, not some other

related material. *See Bosley v. Wildwett.com*, 310 F. Supp. 2d 914, 924 (N.D. Ohio 2004) (an

advertisement for newsworthy material is not insulated under similar statute); *Daniels v.

FanDuel, Inc.*, 884 F.3d 672, 674 (7th Cir. 2018) ("*Daniels II*") (material, not name or likeness,

must be newsworthy). Mr. Fry is not challenging Ancestry's use of his yearbook image on their

website generally; he specifically challenges its use in conjunction with advertising. *See

generally* DE 1; *see* DE 24 at 16 ("Plaintiff does not protest Ancestry's distribution of their

yearbooks. Plaintiff protests Ancestry's unauthorized use of their personas in advertisements.")

Ancestry cannot seriously argue that its ads alone are "material that has political or

newsworthy value," even as broadly as that term has been defined. *Cf. Stayart v. Google Inc.*,

710 F.3d 719, 723 (7th Cir. 2013) (newsworthy material not for an "advertising purpose" under

similar statute). Ancestry contests this, writing that *Daniels I* rejected the argument that the

newsworthiness exception cannot apply to advertisements. This all paints with too broad a brush.

*Daniels I* merely held that the newsworthiness exception may "apply in the context of

commercial use;" it differentiated between use of the information behind a paywall (which

remained newsworthy) and the use of the information in advertising (which "lies outside the

scope of what is considered newsworthy"). 109 N.E.3d at 398. Thus, the Court is not persuaded

that the newsworthiness exception prevents Mr. Fry's statutory or common law claims from proceeding.[6]

Ancestry's argument regarding literary works fairs no better. Ancestry points out Indiana precedent allows video games to be literary works. *See Dillinger, LLC v. Elec. Arts Inc*., 795 F. Supp. 2d 829, 836 (S.D. Ind. 2011). This is true, and the case holding that video games may be literary works provided a litany of citations in support of that position and a robust explanation. *See id*. Ancestry offers no citation for the proposition that advertisements are literary works, and relies entirely on mischaracterizing the contested material as the yearbooks themselves. (DE 19 at 18.) Therefore, the Court does not find the exception for literary works relieves Ancestry of liability for use of Mr. Fry's likeness in its advertisements.

> *(b)   Ancestry's other arguments also fail.*

In its final arguments, Ancestry writes that it should be excepted from liability because it alternately (1) is not a publisher or speaker, just a website, and so should be sheltered from liability under Section 230; (2) is in fact a speaker, and so is protected under Indiana's anti-SLAPP statute, or (3) is just using already copyrighted material, so the claims are preempted by the Copyright Act. The Court does not find these arguments meritorious, and will not expend a great amount of time on them, instead referring the parties to the excellent opinions of the sister courts in *Sessa* and *Bonilla.* As those courts found, Ancestry's ads represent commercial speech not in furtherance of the public interest, so neither Section 230 nor the anti-SLAPP statute apply.

---

[6] The parties do not agree regarding whether a newsworthiness exception applies to Mr. Fry's common law claims. It might; one Indiana court discussed the public interest exception in the context of several similar privacy claims. *See Near E. Side Cmty. Org. v. Hair*, 555 N.E.2d 1324, 1335–36 (Ind. Ct. App. 1990); *see also Bosley v. Wildwett.com*, 310 F. Supp. 2d 914, 924 (N.D. Ohio 2004) (carving out a newsworthiness exception to common law misappropriation). Even if there is no common law newsworthiness exception, the same general idea is captured in the Restatement's comment on incidental use. Restatement (Second) of Torts § 652C cmt d (1977). In any event, no exception applies on these facts.

*See Bonilla*, 574 F.Supp.3d at 592 (Ancestry is not a mere conduit for the posts of others and therefore is not eligible for Section 230 protection); *Sessa*, 561 F.Supp.3d at 1034–35 (Ancestry's ads are not eligible for anti-SLAPP protection for the same reason they are not newsworthy); *see also Kellman v. Spokeo*, Inc., 599 F. Supp. 3d 877, 898 (N.D. Cal. 2022) (Defendant "is not alleged to merely host *user-generated* content, it is alleged to actively take content from other sources, curate it, and upload it to its site in a novel configuration for repurposed uses. That makes it at least 'in part' responsible for the 'creation and development' of this material") (emphasis original).

The Court further finds Ancestry's argument that Mr. Fry's claims are preempted by the Copyright Act unavailing. The Copyright Act preempts a state law claim if the subject matter of the state law claim falls within the subject matter of copyright and if the rights asserted under state law are equivalent to those contained in the Copyright Act. *Sessa*, 561 F.Supp.3d at 1031. The Court analyzes only the second question and finds that the rights asserted by Mr. Fry are not equivalent to those contained in the Copyright Act. The real right at issue here is Mr. Fry's right to privacy in his identity, and to control the when and how his likeness is used to promote a product. Many courts have found a person's identity cannot be contained within a photograph and the right implicated is not protected by or in conflict with copyright law. In *Toney*, the Seventh Circuit clearly stated, "Copyright laws do not reach identity claims such as [plaintiff's]. Identity, as we have described it, is an amorphous concept that is not protected by copyright law; thus, the state law protecting it is not preempted*." Toney v. L'Oreal USA, Inc*., 406 F.3d 905, 910 (7th Cir. 2005). The court wrote that the plaintiff's "identity is not fixed in a tangible medium of expression" because "[a] person's likeness—her persona—is not authored and it is not fixed. The fact that an image of the person might be fixed in a copyrightable photograph does not change

this." *Id*. This Court would be satisfied to decide the issue based on that clear circuit precedent alone, but it also notes other circuits are in accordance. *See In re Jackson*, 972 F.3d 25, 37–38 (2d Cir. 2020) (right of publicity claims based in privacy or consumer protection not preempted); *Brown v. Ames*, 201 F.3d 654, 661 (5th Cir. 2000) ("Since appellees' misappropriation claims neither fall within the subject matter of copyright nor conflict with the purposes and objectives of the Copyright Act, the claims were not preempted."); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1004 (9th Cir. 2001) ("A person's name or likeness is not a work of authorship within the meaning of 17 U.S.C. § 102. This is true notwithstanding the fact that Appellants' names and likenesses are embodied in a copyrightable photograph.") The argument that Mr. Fry's claim is preempted by federal copyright law is without merit.

### D.  Conclusion

Therefore, the Court DENIES Ancestry's motion to dismiss. (DE 18.) The Court further DENIES as moot Ancestry's motion for oral argument (DE 30), as the Court fully considered the arguments raised in the briefs and did not find oral argument necessary for a fair and proper resolution of the motion to dismiss.

SO ORDERED.

ENTERED: March 24, 2023

/s/ JON E. DEGUILIO
_____
Chief Judge

United States District Court